UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| ANGENETTE HUMPHREY for T.W., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 4:05CV224 CDP |
| JO ANNE B. BARNHART, Commissioner of Social Security, | ) ) ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

This is an action under 42 U.S.C. § 405(g) and § 1383(c)(3) for judicial review of the Commissioner's final decision denying Plaintiff Angenette Humphrey's application on behalf of her minor daughter, T.W., for supplemental security income benefits under Title XVI of the Act, 42 U.S.C. § 1381, et seq. In her complaint, Humphrey claims that T.W. is disabled because she has oppositional defiant disorder and borderline intellectual functioning. The Administrative Law Judge, however, found that T.W. was not disabled and therefore did not qualify for Supplemental Security Income, after considering the objective evidence in the record, including T.W.'s age, education and work experience. Because I find that the decision denying benefits was supported by substantial evidence, I will affirm the decision.

## Procedural History

On June 12, 2000, Humphrey filed an application for Supplemental Security Income benefits pursuant to Title XVI of the Social Security Act, 42 U.S.C. § 1381 et seq., on behalf of her daughter, T.W., alleging that her disability began on January 1, 1997. Plaintiff alleged her daughter was disabled because of a learning disability, nerves, headaches, and angry, violent outbursts. The application was denied, and plaintiff requested a hearing, which was held on August 8, 2001, before Administrative Law Judge James E. Seiler. The ALJ determined that T.W. was not disabled within the meaning of the Social Security Act. The Appeals Council then denied Humphrey's request for review.

Humphrey then filed a complaint in this court, Case No. 4:02CV606RWS. On March 27, 2003, United States District Judge Rodney W. Sippel remanded the case to the ALJ because the ALJ did not fully and fairly developed the facts and did not properly consider the opinion of T.W.'s treating psychologist, Dr. Pollio. On May 25, 2004, Plaintiff appeared at a hearing before Administrative Law Judge James B. Griffith. On October 7, 2004, the ALJ determined that T.W. was not disabled within the meaning of the Social Security Act. The Appeals Council of the Social Security Administration again denied Plaintiff's request for review.

Thus, the decision of the ALJ stands as the final determination of the Commissioner.

## Evidence Before the Administrative Law Judge

T.W. was born on September 15, 1987, and was 16 years old and in the tenth grade at the time of the second administrative hearing on May 25, 2004. T.W. lives with her mother, Angenette Humphrey, and her 13 year old sister.

Humphrey testified that T.W. has problems with nerves and displays angry outbursts and throws tantrums when she is upset and angry. During the outbursts, T.W. screams and hollers, throws everything in the house, and threatens herself. Humphrey estimated that T.W.'s episodes occur about three to four times within a month. Humphrey testified that triggers of the episodes include when T.W. gets in trouble at home or when her school calls to say she is behind in homework. T.W. also gets angry when her mother tells her to do chores such as clean her room.

Humphrey testified that T.W. has been tested but has never received any special education and has never been retained in a grade in school. Teachers have suggested that she should attend Academic Lab to catch up with her work. Humphrey testified that T.W. misses whole days of school due to hour-long appointments with her treating psychologist, Dr. Pollio, and her treating psychiatrist, Dr. Surratt, on different days because the transportation provided

through Medicaid with Health Care USA will not take T.W. to school after her appointments. Humphrey testified that T.W. had seen Dr. Pollio for the two or three years previous to the hearing but that there was a nine or ten month period in 2003 when T.W. did not see him. She testified that T.W. had previously seen Dr. Pollio every week but that at the time of the hearing T.W. was seeing him every two weeks in order to decrease the amount of school she missed.

Humphrey testified that Dr. Surratt prescribed 20 milligrams of Celexa to be taken everyday for T.W. when she kept threatening herself, but that she continues to threaten herself when she gets angry. She testified that the medication did not have any side effects on T.W. that she noticed. In addition, Humphrey testified that there was a period of time when T.W. did not meet with Dr. Surratt because Dr. Surratt was changing offices.

Humphrey testified that T.W. has some friends in her neighborhood. She does not have any problems with coordination, personal care, safety, and sleeping and is able to go to the store by herself.

T.W. testified at the hearing that she thinks she needs help in trying to bring up her grades. She also testified that she could go get the assignments that she misses the next day, but that she just does not do so.

## Medical and Educational Records

On March 22, 2000, the Special School District of St. Louis County, Missouri conducted an initial multidisciplinary evaluation of T.W. as requested by Humphrey and T.W.'s school. The request for an evaluation was approved by the Screening Review Committee because T.W. had failed screenings in the areas of language, cognition, reading, math, and written expression and because task related behaviors were an area of concern. T.W. was administered a Wechsler Individual Achievement Test (WIAT) which resulted in a reading composite score at the 18th percentile, a math composite score at the 18th percentile, a listening comprehension assessment at the 10th percentile, and a writing composite score at the 12th percentile. A Clinical Evaluation of Language Fundamentals-3 (CELF-3) administered on February 25, 2000, revealed a receptive language score of 86, an expressive language score of 96 and a total language score of 90. T.W.'s reading, writing, listening and math skills were considered within cognitive ability. After the testing and evaluation of T.W., the Special School District determined in April 2000, that the evidence did not support a suspicion of any disability and that no further action was needed, other than monitoring by the building level team.

On May 3, 2000, Dr. Eleatha Surratt, M.D. saw T.W. for an initial child psychiatry evaluation. Dr. Surratt noted that T.W. had a history of disruptive

behavior and that she was seeing Dr. David Pollio, Ph.D. at BJC Behavioral Health. Dr. Surratt's notes indicate that T.W. had a diagnosis of disruptive behavior disorder NOS, learning disorder NOS, and communication disorder NOS. On mental status examination, Dr. Surratt noted that T.W.'s speech had a somewhat regressive quality, that she had an articulation problem, and that she had an average to borderline IQ by estimate. Dr. Surratt noted that T.W. had witnessed a stepfather who was abusive. A trial of Risperdal was initiated.

Treatment notes from Dr. Surratt on June 6, 2000 reflect that T.W. had been arguing with her brother, ignoring her mother when she called her, not helping with chores, and throwing tantrums. Mental status examination noted that T.W. was a cute pre-teen black female with minimal speech, speaking in a regressed voice with shy mannerisms. T.W. was to continue taking Risperdal.

On July 26, 2000, T.W. was assessed by Jennifer Bosse, M.S., CCC/SLP, a speech and language pathologist. Boss found that T.W. exhibited a mild articulation and language disorder characterized by distortions of certain sounds in conversations and below average receptive and expressive language skills. Bosse recommended that T.W. receive individual speech and language therapy with an emphasis on improving her production of certain sounds as well as improving her language skills. On an administration of a Clinical Evaluation of Language

Fundamentals (CELF-3),T.W. obtained a receptive language score of 82, an expressive language score of 88, and a total language score of 84 which yielded an age equivalent of 10 years, 9 months. At the time of testing, T.W. was 12 years and 10 months old. On the Goldman-Fristoe Test of Articulation-2, T.W. was noted to have a raw score of 7, a standard score of 82, a percentile rank of 1 with an age equivalent of 4.11 years to 5.3 years. Intelligibility was judged to be good in single words and fair in conversation but declined in spontaneous speech due to additional articulation errors and a decrease in loudness. Intelligibility was assessed as being 100% in a known context and 90% in an unknown context. Humphrey reported that strangers understood none of T.W.'s speech. T.W. was able to improve the intelligibility of the message with repetition. She had difficulty following verbal directions, grouping words in sequence and forming given words into sentences. During spontaneous conversation, T.W. was not able to produce a full range of communication intentions including labeling, requesting, commenting, describing, and informing. T.W. did not voluntarily participate in social exchanges with the examiner but did answer questions when asked.

On July 28, 2000, Jean Jose, Ph.D., a psychologist, conducted a psychological consultive evaluation. Dr. Jose administered a Stanford-Binet Intelligence test, which resulted in a test composite score of 79, placing T.W. in the

borderline range. T.W.'s verbal reasoning standard age score was 90, her abstract and visual standard age score was 80, quantitative reasoning standard age score was 78 and short term memory standard age score was 78. T.W.'s ability to perform basic tasks and make decisions required for daily living as well as her social functioning appeared to be fairly adequate. Behavior in a one on one structure was appropriate, although Dr. Jose reported that T.W. may not be able to maintain this in other situations. T.W. was diagnosed with borderline intellectual functioning and a Global Assessment of Functioning (GAF) Axis V of 71.

In August 2000, Angela Haggerty, M.S., CCC-SLP and R. Rocco Cottone, Ph.D. completed a childhood disability evaluation form. The assessment noted that T.W. had an articulation disorder, language disorder, and a disruptive behavior disorder. The impairments were considered severe but did not meet, were not medically equal or were not functionally equal to the severity of the listing. T.W. was assessed as having less than marked impairment in cognitive/communicative functioning, social functioning, personal functioning, and concentration, persistence and pace. T.W. was assessed as having no evidence of limitation in motor skills.

In August 2000, counselor Jill Henderson completed a Teacher Questionnaire. Henderson noted that she had known T.W. for one year and that

she had been seeing her daily during the 1999-2000 school year.  T.W. had difficulty keeping up with the rest of the class due to low ability level and frequent absences.  T.W. had many missing assignments and work that was incomplete, and the work that was complete was often inaccurate.  T.W. required directions to be repeated and often required one on one reinforcement.  T.W. reportedly got along well with peers and teachers, and had no behavioral problems. The report stated that T.W. had no problems with concentration and attention.

A report card from the 1999-2000 school year reflected failing grades in three classes and C's and D's in others.  She had an A in physical education.

On October 4, 2000, Dr. Pollio, T.W.'s treating psychologist, assessed T.W.'s Global Assessment of Functioning (GAF) at 68.  Dr. Pollio's treatment records reflect temper tantrums, fighting with siblings, non-compliance with her mother, and some difficulty with school behavior.  Behavioral therapy was to continue at home and individual therapy was to continue with Dr. Pollio.

On November 15, 2000, Dr. Surratt noted that T.W. was doing "OK" at school and that T.W.'s grades were in the margin.  Mental status examination noted that T.W. was stable, playfully oppositional and asked for some privileges.  Her grades were up from all F's to only two F's.  A major problem continued to be her arguing excessively with her brother.  Dr. Surratt informed the school in a

November 15, 2000 statement that T.W.'s medication had been increased to include a morning dose of Risperdal and that she may experience some sleepiness with the increase.

Dr. Pollio's treatment notes from November 20, 2000 and December 20, 2000 indicate that he continued to give the family therapy. On January 17, 2001, Dr. Pollio noted that Humphrey described a lot of incidents with T.W.'s behavior, which were "relatively minor," but with some frequency. Treatment notes from April 18, 2001 reflect that T.W. had been fighting with siblings, non-compliant with mother, had some school problems and was having behavioral therapy at home.

On June 26, 2001, Dr. Surratt noted in her treatment notes that T.W. was seen for medication management and psychotherapy. She noted that T.W. remained volatile at home with no behavior problems at school. T.W. had been compliant with medications. On mental status examination, T.W. was noted to be quiet and regressed and could barely acknowledge problems but still had a babyish voice. Sessions were to continue with Dr. Pollio.

On July 18, 2001, Dr. Pollio completed a narrative report in which he stated that T.W.'s diagnosis was oppositional defiant disorder and a GAF of 60. He noted that T.W. had been exhibiting explosive episodes at approximately one to

two major episodes per week. Dr. Pollio completed a child's disability assessment in which he opined that T.W. had marked impairments in the domains of acquiring and using information, interacting and relating to others, and attending to and completing tasks and moderate impairments in the domains of caring for self and moving and manipulating objects.

An evaluation summary by the Special School District dated April 25, 2002 reflected that T.W.'s school had significant educational concerns in the areas of academic progress, but had no concerns for T.W. in the areas of vision, hearing, health, motor, cognition, speech, language, and social-emotional behaviors. The school did not report any issues with T.W.'s behavior at school and no medical diagnosis had been shared with the school. The evaluation summary noted that T.W. was functioning in the lower third of her class in reading, math, and written expression. SSD again concluded that T.W. was not disabled. The evaluation summary noted that T.W.'s functioning was below age and grade level expectations but that her academic skills were consistent with measured cognitive functioning. While Special Education Services were not available, T.W. would need modification of assignments, extended time limits to complete verbal, visual, and written tasks, repetition and preview of newly presented vocabulary and concepts to benefit from the regular education curriculum.

On May 28, 2002, Dr. Surratt noted that T.W. was doing "fair to OK" at school, and that she had B's, C's and D's. Her tantrums were continuing but reported to be less frequent, and she spoke in a less babyish voice than previously used. On July 23, 2002, T.W. reported to Dr. Surratt that she was doing "OK" with summer school and enjoyed the opportunity to meet new friends and "OK" with relating to her mother and siblings. She reported that she was doing "OK to fair" with her chores.

On October 1, 2002, Dr. Surratt's treatment notes reflect that T.W.'s main problems remained tantrum outbursts with yelling, throwing, and breaking objects which often occurred in association with chore requests from Humphrey. On mental status examination, it was noted that T.W. rarely used baby talk.

On September 24, 2003, Dr. Surratt saw T.W. She was still having tantrums at home although they had decreased. T.W. reported to Dr. Surratt that she liked school and had friends. Her concentration was "OK," and she had a summer job. T.W. had a mild speech impediment which produced a "somewhat babyish talk."

On March 24, 2004, Dr. Pollio saw T.W. in therapy and noted that she was having continuing problems with communication issues.

On April 15, 2004, Dr. Surratt completed a narrative report stating that she had known T.W. since 1998 with a lapse in follow up visits during change of office

site between 2002 to 2003. T.W. had been followed for behavioral outbursts, which could be aggressive in nature as well as a history of learning disability. Medication had variable effect, psychotherapy sessions were strongly recommended to be continued possibly with the addition of an individual therapist.

On April 21, 2004, Dr. Pollio completed a narrative report noting T.W. had a history of behavioral disturbances, including verbal and physical confrontation with siblings and her mother. He stated that although there had been no formal testing, evidence uncovered during here office visits, including written work, suggested the strong possibility that T.W. had an undiagnosed learning disability. Her ongoing classroom performance and difficulties in developing successful behavior interventions in the classroom setting argued strongly for the need for a complete assessment.

A May 26, 2004 letter from Dr. Pollio reflected his opinion that T.W. remained at approximately the same level of disability over the time that he had seen T.W. and the family (since 1998). In addition, he opined that the condition was likely to remain constant over the immediate future and that he remained convinced that T.W. had an undiagnosed learning disability likely to be more pervasive than previous assessments.

Dr. Pollio completed a mental residual functional capacity questionnaire. Dr. Pollio indicated that T.W. had a diagnosis of 313.81, 309.28 rule out 315.00, with an Axis V current GAF of 51 and a highest GAF in the past year of 55. T.W. had been in behavioral therapy and family therapy. He opined that her prognosis was poor, and that she was continually acting out at home and had severe academic problems. He reported that she had serious limitations in her ability to remember work-like procedures, understand and remember very short and simple instructions, maintain regular attendance and be punctual, sustain an ordinary routine without special supervision, make simple work related decisions, complete a normal work day or work week without interruptions, perform at a consistent pace without an unreasonable number and length of rest period, accept criticism and instruction appropriately from supervisors, and respond appropriately to changes in a routine work setting. He stated that he considered T.W. unable to meet competitive standards in being able to maintain attention for two hour segments, work in coordination within proximity to others without being unduly distracted, deal with normal work stress, and be aware of normal hazards and take appropriate precautions. Dr. Pollio estimated that T.W. would miss four days a month as a result of the impairments and noted that her tests continue to demonstrate oppositional behavior, poor impulse control, and limited attention.

## Legal Standard

A court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Gowell v. Apfel, 242 F.3d. 793, 796 (8th Cir. 2001). Substantial evidence is less than a preponderance, but is enough so that a reasonable mind would find it adequate to support the ALJ's conclusion. Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000). As long as there is substantial evidence on the record as a whole to support the Commissioner's decision, a court may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, id.., or because the court would have decided the case differently. Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir. 1992). In determining whether existing evidence is substantial, a court considers "evidence that detracts from the Commissioner's decision as well as evidence that supports it." Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000)(quoting, Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999)).

To determine whether the decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

(1) the credibility findings made by the Administrative Law Judge;

(2) the education, background, work history, and age of the claimant;

(3) the medical evidence from treating and consulting physicians;

(4) the plaintiff's subjective complaints relating to exertional and non-

     exertional impairments;

(5) any corroboration by third parties of the plaintiff's impairments; and

(6) the testimony of vocational experts when required which is based upon a

     proper hypothetical question.

Brand v. Secretary of Dep't. of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th

Cir. 1980).

     For the purposes of determining eligibility of a child under the age of

eighteen for supplemental security income, disability is defined in the social

security regulations as a medically determinable physical or mental impairment or

combinations of impairments that causes marked and severe functional limitations,

and that can be expected to cause death or that has lasted or can be expected to last

for a continuous period of not less than twelve months.  20 C.F.R. § 416.906.  In

determining whether a claimant is eligible for social security income benefits on

the basis of disability, the Commissioner must evaluate the claim using a three step

procedure.

     First, the Commissioner must decide whether the claimant is engaging in

substantial gainful activity.  If not, the Commissioner will next consider whether

the claimant has a severe medically determinable impairment.  Finally, if the

impairment is both medically determinable and severe, the Commissioner will review the claimant's claim further to see if she has an impairment that meets, medically equals, or functionally equals those set forth in the "Listing of Impairments" contained in 20 C.F.R. Part 404, Subpart P, §§ 112.00-112.12. An impairment functionally equals the listing when the impairment results in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. The Commissioner considers how the impairment affects the claimant's functioning in the following six domains:

i) Acquiring and using information;

ii) Attending and completing tasks;

iii) Interacting and relating with others;

iv) Moving about and manipulating objects;

v) Self-care; and

vi) Health and physical well-being.

20 C.F.R. § 416.926a(b)(1).

When evaluating evidence of pain or other subjective complaints, the Commissioner is never free to ignore the subjective testimony of the plaintiff, even if it is uncorroborated by objective medical evidence. Basunger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984). The ALJ may, however, disbelieve a claimant's

subjective complaints when they are inconsistent with the record as a whole. See

e.g., Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). In considering the

subjective complaints, the ALJ is required to consider the factors set out by Polaski

v. Heckler, 739 F.2d 1320 (8th Cir. 1984), which include:

> claimant's prior work record, and observations by third parties and
> treating and examining physicians relating to such matters as: (1) the
> objective medical evidence; (2) the subjective evidence of the
> duration, frequency, and intensity of plaintiff's pain; (3) any
> precipitating or aggravating factors; (4) the claimant's daily activities;
> (5) the dosage, effectiveness and side effects of any medication; and
> (6) the claimant's functional restrictions.

Id. at 1322.

A treating physician's opinion should not ordinarily be disregarded and is

entitled to substantial weight. Singh, 222 F.3d at 451. A treating physician's

opinion concerning a claimant's impairment will be granted controlling weight, if

the opinion is well-supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other substantial evidence in

the record. Id. While a treating physician's opinion is usually entitled to great

weight, the Eighth Circuit has cautioned that an opinion "do[es] not automatically

control, since the record must be evaluated as a whole." Prosch v. Apfel, 201 F.3d

at 1013.

The Eighth Circuit has upheld an ALJ's decision to discount or disregard the opinion of a treating physician in situations in which other medical assessments "'are supported by better or more thorough medical evidence'" or in which a treating physician gives inconsistent opinions that undermine the credibility of the opinions. Id. (quoting Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997)). In any event, whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations require the ALJ to "always give good reasons" for the particular weight the ALJ chooses to give the opinion. Singh, 222 F.3d at 452; Prosch, 201 F.3d at 1013; 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

The Eighth Circuit has consistently held that the ALJ has the "duty to develop the record fully and fairly," even where the claimant is represented by counsel. Freeman v. Apfel, 208 F.3d 687, 692 (8th Cir. 2000); Dozier v. Heckler, 754 F.2d 274, 276 (8th Cir. 1985); Vaughn v. Heckler, 741 F.2d 177, 179 (8th Cir. 1984). This includes the duty to develop the record as to the medical opinion of the claimant's treating physician. See, e.g., Brown v. Bowen, 827 F.2d 311, 312 (8th Cir. 1987); Brissette v. Heckler, 730 F.2d 548, 549-50 (8th Cir. 1984); Thorne v. Califano, 607 F.2d 218, 219-20 (8th Cir. 1979).

If the treating physician "has not issued an opinion which can be adequately related to the [Social Security Act's] disability standard, the ALJ is obligated...to

address a precise inquiry to the physician so as to clarify the record." Lewis v. Schwieker, 720 F.2d 487, 489 (8th Cir. 1983). If the physician's reports of the claimant's limitations are stated only generally, the ALJ should ask the physcian to clarify and explain. See Vaughn, 741 F.2d at 179.

## The ALJ's Findings

The ALJ found that T.W. was not disabled. (Tr. 196). He found that she had not engaged in substantial gainful activity since June 12, 2000, the date her application was filed; that she had been more than minimally limited by oppositional defiant disorder and borderline intellectual functioning and that she thus satisfied the requirement for severe impairment. He then found that her condition did not meet, medically equal or functionally equal a listing in 20 C.F.R. pt. 404, subpt. P, app. 1. He found her mother's allegations were not credible, and concluded that the claimant had not been disabled in accordance with the Social Security Act since June 12, 2000, and thus was not eligible for Supplemental Security Income.

The ALJ found that the objective medical record either did not support or contradicted the allegations of learning disability, headaches, and nerves. The decision noted that T.W.'s Special School District repeatedly found no significant difference between verbal and performance IQ's. SSD repeatedly concluded that

she was not eligible for special school services.  Moreover, Dr. Jose, a consultive

examiner, assessed T.W.'s intellectual status in July 2000 and did not diagnose a

learning disability.  The ALJ did not give Dr. Pollio's assessment of undiagnosed

learning disabilities any weight because Dr. Pollio had not conducted any formal

testing of T.W.'s intellect, while other examiners had done so and had concluded

she did not have any learning disability.

## Discussion

Plaintiff argues that the ALJ's decision is not based on substantial evidence

because the ALJ failed to properly consider the medical opinion of the treating

physician.  Plaintiff also argues that the ALJ failed to properly consider the

subjective complaints of Humphrey under the standards contained in  Polaski v.

Heckler, 739 F.2d 1320 (8th Cir. 1984).

I find that substantial evidence supports the ALJ's decision, and that he

arrived at that decision following a proper legal analysis.  The ALJ determined that

the allegations of disability were not credible and were not supported by the

medical evidence.

Plaintiff argues that the ALJ failed to properly consider the medical opinion

of T.W.'s treating physician, Dr. Pollio.  A treating physician's opinion is given

"controlling weight" if it "is well-supported by medically acceptable clinical and

laboratory diagnostic techniques and is not inconsistent with the other substantial evidence. 20 C.F.R. § 404.1527(d)(2); see Prosch, 201 F.3d at 1012-13.

The ALJ complied with the earlier District Court order and considered Dr. Pollio's opinions. He also stated sufficient reasons for discounting those opinions. The Eighth Circuit has upheld an ALJ's decision to discount or disregard the opinion of a treating physician in situations in which other medical assessments "'are supported by better or more thorough medical evidence'" or in which a treating physician gives inconsistent opinions that undermine the credibility of the opinions. Id. (quoting Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997)). In any event, whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations require the ALJ to "always give good reasons" for the particular weight the ALJ chooses to give the opinion. Singh, 222 F.3d at 452; Prosch, 201 F.3d at 1013; 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

In this case, the ALJ provided reasons for not giving Dr. Pollio's opinion controlling weight, such as the lack of medical evidence and the inconsistency with other substantial evidence. The ALJ noted that Dr. Pollio thought that T.W. may have a learning disability, but that he had not conducted any formal testing of her intellect. In addition, the ALJ explicitly addressed Dr. Pollio's opinions on T.W.'s

functioning in each of the six domains and provided reasons for the weight given to the opinions.

The ALJ noted that T.W. had no marked impairment in her ability to acquire and use information, partly because T.W.'s school district had determined that she was not a candidate for special education services. In addition, Dr. Jose's July 2000 report shows that T.W. attained test scores less than two standard deviations below the mean on the Stanford-Binet Intelligence Scale. Likewise, T.W.'s scores on a March 2000 IQ test were not at least two standard deviations below the mean. Moreover, T.W.'s mother admitted that T.W. had never been held back a grade in school, and although T.W.'s report card for the 2003-04 school year revealed that she had F's in some subjects, she also higher grades in other subjects. The ALJ stated that Dr. Pollio's opinion that T.W.'s ability to acquire and use information had been markedly limited was given virtually no weight because it was not supported by objective data and was inconsistent with T.W.'s school reports and IQ test results. In addition, the decision noted that Dr. Pollio's opinion was internally inconsistent with the global functioning scores he gave T.W. and with her ability to maintain a summer job in 2003.

The ALJ determined that T.W.'s ability to attend to and complete tasks and to interact and relate to others was not markedly or extremely limited. Her

tantrums when asked to do chores was not considered extraordinary conduct, especially since she had not been disciplined at school and was able to maintain friendships. In addition, reports from T.W.'s teacher Ms. Henderson, Dr. Jose, Dr. Surratt and the Special School District of St. Louis County and her report card for the 2003-2004 school year indicate that T.W.'s ability to interact and relate with others had not been markedly or extremely limited. The ALJ stated that Dr. Pollio's opinion that T.W.'s ability to interact and relate with others had been markedly limited was given slight weight because it is inconsistent with the record as a whole and was internally inconsistent. For instance, the worst global functioning score Dr. Pollio gave T.W. was 51 which denotes only moderate difficulty with social functioning. In addition, Dr. Pollio's opinion was inconsistent with T.W.'s ability to maintain employment during the Summer of 2003.

The ALJ noted that there was no evidence that T.W. had limitation in her health and physical well-being. The ALJ also noted that Dr. Pollio's opinion was the only evidence of moderate limitations in T.W.'s ability to move about and manipulate objects and in her ability to care for herself. The ALJ did not give Dr. Pollio's opinion any weight because it was unsupported with objective evidence and inconsistent with the record as a whole, given that Humphrey denies any

problems in these domains and that Dr. Pollio's only diagnosis for T.W. was oppositional defiant disorder.

Plaintiff argues that the ALJ did not evaluate the medical evidence utilizing the factors set out in the regulations. The regulations require the Commissioner to consider the examining relationship, the treatment relationship, the supportability, the consistency of the medical opinion, the specialization of the medical source, and other factors brought to the Commissioner's attention bearing upon the weight medical opinion evidence should be accorded. 20 C.F.R. §§ 404.1527(d)(1)-(6), 416.927(d)(1)-(6). In this case, the ALJ demonstrated that he considered the factors. The ALJ noted that Dr. Pollio had only spent nine hours with T.W. after his intake evaluation in February 2000. The ALJ also noted Dr. Pollio's lack of any formal testing of T.W.'s intellect to support his opinion that T.W. may have a learning disability. The ALJ also discussed the inconsistency of Dr. Pollio's opinion with the record as a whole.

Plaintiff also argues that the ALJ failed to properly consider the subjective complaints of Humphrey under the standards contained in Polaski. While the ALJ is never free to ignore the subjective testimony of a plaintiff, even if it is uncorroborated by objective medical evidence, the ALJ may disbelieve a claimant's subjective complaints when they are inconsistent with the record as a

whole.  See, e.g., Black v. Apfel,143 F.3d 383, 386 (8th Cir. 1998); Battles v.

Sullivan, 902 F.2d 657, 660 (8th Cir. 1990); Outsell v. Sullivan, 892 F.2d 747, 750

(8th Cir. 1989).  It is not enough that the record contains inconsistencies; the ALJ

must specifically demonstrate that he considered the relevant evidence.  Jeffrey v.

Secretary of Health & Human Servs., 849 F.2d 1129, 1132 (8th Cir. 1988); Butler

v. Secretary of Health & Human Servs., 850 F.2d 425, 429 (8th Cir. 1988).

Credibility determinations, when adequately explained and supported, are for the

ALJ to make.  Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000).  Because the ALJ

gave his reasons for discrediting Humphrey's claim, which were supported by the

record, I will defer to his judgment.  Hogan v. Apfel, 39 F.3d 958, 962 (8th Cir.

2001).

      In this case, the ALJ properly followed the Polaski requirements insofar as

they are applicable to children.  The ALJ considered the record as a whole,

including Humphrey's testimony, school assessments and statements, medication

and side effects, testimony from treating and examining physicians, and T.W.'s

daily activities, and found that Humphrey's allegations that T.W. was disabled

were not credible and were inconsistent with the record.  As noted above, he did

not consider T.W.'s tantrums when asked to do chores to be extraordinary conduct

by an adolescent, especially where the record was otherwise unremarkable.  In

addition, the ALJ noted that Humphrey's concessions that T.W. had never been held back a grade in school, had not been disciplined at school, and was able to maintain friendships in the neighborhood were inconsistent with her allegations of a disability. The ALJ also stated that Humphrey denied any problems in T.W.'s ability to move and manipulate objects or in her ability to care for herself. The ALJ discredited Humphrey's testimony as inconsistent with the record as a whole. I cannot say that the ALJ's determination conflicted with the evidence.

Considering the factors set forth in <u>Polaski</u>, 739 F.2d at 1330, I find that the ALJ's determination of no disability is supported by substantial evidence in the record as a whole, and should therefore be upheld.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is affirmed.

A separate judgment in accord with the Memorandum and Order is entered this date.

CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 26th day of September, 2006.